**Susan ULICHNY, Plaintiffs,**

v.

**MERTON COMMUNITY SCHOOL DISTRICT, et al., Defendants.**

No. 98–C–1144.

United States District Court, E.D. Wisconsin.

March 21, 2000.

Robert E. Shumaker, Jacob P. Westerhof, Stephen A. DiTullio, DeWitt Ross & Stevens, Madison, WI, for Plaintiff.

Steven B. Rynecki, von Briesen Purtell & Roper, Milwaukee, WI, Linda S. Isnard, Gilbert J. Berthelsen, von Briesen Purtll & Roper, Racine, WI, Thomas R. Schrimpf, Hinshaw & Culbertson, Milwaukee, WI, for Merton Community School District, Board of Education of the Merton Community School District.

Michele M. Ford, Raymond J. Pollen, Crivello Carlson Mentkowski & Steeves, Milwaukee, WI, for Mark Flynn.

W. Ted Tornehl, Patrick S. Nolan, Borgelt Powell Peterson & Frauen, Milwaukee, WI, Michele M. Ford, Raymond J. Pollen, Crivello Carlson Mentkowski & Steeves, Milwaukee, WI, for Timothy F. O'Neill.

Michele M. Ford, Raymond J. Pollen, Crivello Carlson Mentkowski & Steeves, Milwaukee, WI, for Cathy Weis, Ellwn Wood.

Robert J. Dreps, LaFollette Godfrey & Kahn, Madison, WI, for Wausau Underwriters Insurance Company, Employers Insurance of Wausau.

Philip C. Reid, Cook & Franke, Milwaukee, WI, for Commercial Underwriters Insurance Company.

## DECISION AND ORDER

RANDA, District Judge.

This matter comes before the Court on defendants' joint motion for summary judgment. For the following reasons, the motion is granted as to plaintiff's federal claims, which are dismissed. In light of the dismissal of the federal claims—which provided the basis for the Court's subject matter jurisdiction—the Court declines to exercise its supplemental jurisdiction over the remaining state law claims, which are remanded to state court.

### I

The following facts are undisputed. In or around August, 1995, the Merton Community School District ("MCSD" or "School District" or "School Board") hired Susan Ulichny ("Ulichny") to serve as a District Principal. (Defendants' Proposed Findings of Fact ("DFOF") at ¶ 1; Plain-

tiff's Response to DFOF ("PR") at ¶ 1.) Ulichny's initial contract was for roughly one year, spanning from August 14, 1995 to July 9, 1996. (Ulichny Aff., Ex. 2. at 1.) Renewal and/or non-renewal of the contract was governed by Wis. Stat. § 118.24, which generally provides that a principal's contract is automatically renewed for a subsequent term unless the school board provides a notice of non-renewal to the principal at least four months prior to the contract's expiration.[1] (Id. at 3.) *See also,* Wis. Stat. § 118.24(6). Absent non-renewal, the contract could only be terminated by mutual consent of the parties or by the School Board upon a showing of "just cause" after providing Ulichny with notice and an opportunity to be heard. (Id.) Under the "RESPONSIBILITIES" section of the contract, Ulichny agreed, *inter alia,*

> ... to perform at a professional level of competence the services, duties and obligations required by the laws of the State of Wisconsin and the rules, regulations and policies of the Board which are now existing or which may be hereinafter enacted by the Board.

[and]

> ... to devote full time to the duties and responsibilities normally expected of the Principal's position during the term of this contract, and shall not engage in any pursuit which interferes with the proper discharge of such duties and responsibilities.

(Id. at 1.) The School Board, in turn, agreed "to furnish [Ulichny] with a written copy of all ... rules, regulations and policies now in effect or becoming effective during the term of this contract," and to further "provide [Ulichny] with a written job description of the services, duties and obligations" of the Principal position. (Id.)

At the time Ulichny was originally hired, Bruce Connolly ("Connolly") was the District Administrator for the MCSD. (Plaintiff's Proposed Findings of Fact ("PFOF") at ¶ 4.) It appears Ulichny was initially assigned to serve as the K–8 Principal of the Merton School, an entity housing some 730 students.[2] (DFOF at ¶ 4; PR at ¶ 4; Connolly Aff. Ex. B at 1.) Connolly subsequently evaluated Ulichny's performance during her first year. (DFOF at ¶ 4; PR at ¶ 4.) As part of that process, Connolly reviewed feedback forms that had been filled out by staff and teachers at Merton School. (Connolly Aff., Ex. C; DFOF at ¶ 5; PR at ¶ 5.) The feedback forms both praised and criticized Ulichny, identifying many areas of strength and also many areas of weakness. (Connolly Aff., Ex. C; PFOF at ¶¶ 6–7; DFOF at ¶¶ 7–8; PR at ¶¶ 7–8.) Similarly, Connolly's formal, written evaluation of Ulichny's first-year performance—issued September 23, 1996 at or near the beginning of Ulichny's second school year[3]—was a mixed bag of identified strengths, weaknesses, and areas for improvement. (Connolly Aff., Ex. B.) Ultimately, Connolly concluded that he "would not characterize Mrs. Ulichny's first year as a completely successful one" and that "some of the negatives outweighed the positives." (Id. at 10.) Accordingly, Ulichny was provided with various recommendations and expectations for her second school year, and Connolly expressed his expectation that Ulichny would draft a written plan for improvement. (DFOF at

---

1. The statute also requires a preliminary notice—at least five months before the contract expires—that the school board is considering the non-renewal of such a contract. *See,* Wis. Stat. § 118.24(7). Upon receipt of such a preliminary notice, the employee at issue has seven days to request a hearing before the school board prior to its issuance of the final notice of non-renewal, discussed *supra. See* id.

2. It also appears that some time shortly after Ulichny was hired, a new school building was opened and the Merton School was separated into two schools, one housing grades K–5 and the other housing grades 6–8. (Connolly Aff. Ex. B at 2.)

3. The School Board apparently extended Ulichny's original one-year contract for an additional year. (DFOF at ¶ 1; PR at ¶ 1.)

¶ 12; PR at ¶ 12; Connolly Aff., Ex. B at 10.) Shortly thereafter, Connolly resigned his position as District Administrator, effective October 1, 1996. (PFOF at ¶ 4.) Approximately four weeks later, Connolly was replaced (temporarily) by Michael Budisch ("Budisch"), who served as Interim District Administrator. (Id.)

Budisch subsequently evaluated Ulichny's performance during her second school year and reviewed additional feedback forms from teachers and staff.[4] (DFOF at ¶ 16; PR at ¶ 16; Budisch Aff. at ¶ 4, Ex. D.) As was the case with Ulichny's first year evaluation, the feedback forms were a mixed bag of praise and criticism, and a review indicates that the staff and teachers were quite divided on the merits of Ulichny's performance—some thought very highly of her, others had equally strong concerns. (Budisch Aff., Ex. D.) Because of the uneven nature of the staff evaluations, the School Board served Ulichny with preliminary notice of non-renewal on January 31, 1997, pursuant to Wis. Stat. § 118.24(7). (Budisch Aff., Ex. E.) As indicated earlier—see, footnote 1, *supra*—this document served notice on Ulichny that the School Board was considering the non-renewal of her contract and that she was entitled to a hearing before the Board prior to a final decision. As was her right, Ulichny requested a private hearing before the Board with her lawyer and members of the Intermediate Advisory Council present. (DFOF at ¶ 21; PR at ¶ 21; Budisch Aff., Ex. F.) Her request was granted and a private hearing was scheduled for February 26, 1997. (DFOF at ¶¶ 22–24; PR at ¶¶ 22–24.) Ulichny and various staff members who supported her spoke at length at the hearing about the criticisms that had been leveled against her through the staff and teacher feedback forms. (Budisch Aff., Ex. H at 2–76.) Much of the discussion focused on criticisms alleging a negative "school climate," "strained relationships" and/or poor communication between Ulichny and some members of the staff. (Id.)

On March 7, 1997, The School Board notified Ulichny that it was not renewing her contract. (DFOF at ¶ 32; PR at ¶ 32.) However, the School Board offered her a one-year contract for the 1997–98 school year as the Merton Intermediate School Principal.[5] (DFOF at ¶ 33; PR at ¶ 33.) Ulichny accepted the offer. (DFOF at ¶ 34; PR at ¶ 34.) Ulichny signed her new one-year contract on April 8, 1997, the relevant terms of which were identical to those in her prior contract. Subsequently, the School Board issued a formal, written evaluation of Ulichny's performance during the 1996–97 school year. (Budisch Aff., Ex. L.) Consistent with the criticisms leveled against Ulichny by some of the staff and teachers, the School Board concluded that "Ms. Ulichny's leadership skills need a great deal of improvement" and "that a large group [of faculty and staff] lacks confidence in her abilities as a principal." (Id.) The School Board cited "school improvement, school climate, leadership, and interpersonal relationships" as the areas where there was "a significant need for improvement on Ms. Ulichny's behalf." (Id.) The Board suggested that Ulichny "register for classes and workshops" to help her improve in those areas and stated its "expectation ... that there will be measurable and significant improvement" in Ulichny's performance. (Id.) The Board

---

4. The feedback forms were actually prepared and reviewed in or around December, 1996, near the mid-point of Ulichny's second year. (PR at ¶ 16.) This mid-year evaluation was probably necessitated by the fact that Ulichny only had a one-year contract. As indicated *supra*, Wis. Stat. § 118.24 required notice of non-renewal to be given (if at all) at least four months before the contract expired. Thus, waiting until the end of the school year to evaluate Ulichny would have precluded non-renewal as an option for the School Board.

5. This appears to have involved a reduction in duties, insofar as the record indicates that Ulichny served as principal for grades K–8 prior to this change. However, the change may simply reflect that grades K–8 were now housed in two separate buildings—an Elementary School and an Intermediate School.

also directed that Ulichny agree to a formal "plan of assistance" that included "a process of continuous evaluation and feedback on the areas previously noted" and "goals and steps to accomplish these goals." (Id.)

On July 1, 1997, Mark Flynn ("Flynn") was hired as District Administrator. (DFOF at ¶ 41; PR at ¶ 41.) In accordance with the Board's direction, Flynn prepared a formal assistance plan for Ulichny, dated August 7, 1997, which identified four areas for improvement—school climate, leadership skills, interpersonal skills and communication skills—and listed various goals and concrete actions for Ulichny to perform along with corresponding timetables for reaching or completing the same. (DFOF at ¶ 43; PR at ¶ 43; Flynn Aff., Ex. N.) The plan provided for weekly meetings between Flynn and Ulichny to monitor her progress in team building skills and healthy communication (DFOF at ¶ 45; PR at ¶ 45.) In addition, Flynn was to prepare quarterly written progress reports regarding Ulichny's development on each of November 1, January 1, March 1 and June 15. (PFOF at ¶ 11; Defendant's Response to PFOF ("DR") at ¶ 11; Flynn Aff., Ex. N.) Flynn also gave Ulichny—at her request—a memo outlining the deadlines applicable to the renewal and/or non-renewal of her contract, which was set to expire on June 26, 1998. (DFOF at ¶ 47; PR at ¶ 47.)

On October 14, 1997, five or six 7th and 8th grade students were involved in a playground incident whereby they surprised another boy, forced him to the ground, and gave him what is commonly referred to as a "wedgie," i.e., they grabbed the top of his underwear from his backside and pulled up forcibly.[6] (DFOF at ¶ 48; PR at ¶ 48; PFOF at ¶¶ 13–14.) Distraught, the boy ran to Principal Ulichny's office in tears, related what happened and asked if he could call his mother because he needed a new pair of underwear. (PFOF at ¶ 13.) Ulichny called District Administrator Flynn, related the situation and suggested that they call the sheriff's department. (PFOF at ¶ 15.) Flynn agreed. (Id.) Ulichny then called the school's D.A.R.E. officer, Deputy Haizel ("Haizel"), because he had a long relationship with the students at Merton Intermediate School.[7] (Id.) After speaking with Ulichny, the students involved, and some of the students' parents, Deputy Haizel issued each of the students (other than the victim, of course) a citation for disorderly conduct. (PFOF at ¶¶ 17–19.) Ulichny then notified the relevant parents of the incident, the involvement of law enforcement and the issuance of disorderly conduct citations, and her corresponding decision to discipline the students with suspensions. (DFOF at ¶ 50.) Some of the parents expressed their belief to Deputy Haizel and/or Ulichny that the incident was being blown out of proportion and threatened to complain to the School Board. (PFOF at ¶¶ 17–18.)

The "wedgie" incident garnered a great deal of media attention, both locally and nationally. (PFOF at ¶ 20.) Local newspaper stories reported details of the incident, including the criticisms of some of the parents regarding the manner and harshness of the disciplinary measures taken. (Ulichny Aff., Ex. 10.) The School District also began to receive responses from the community regarding the inci-

6. To be fair, this was not a quick "grab and release" wedgie, a childhood prank between friends that even the Court remembers. This particular "wedgie" was of a very aggressive variety, i.e., there were 5–6 kids against 1, they forced their victim to the ground, they pulled so hard on his underwear that he was lifted into the air and dropped back to the ground, and his underwear tore in two places. The victim ran away crying. In short, this was not playful behavior between friends; it was a mean-spirited act of cruelty intended to humiliate the child at issue.

7. The Court is generally aware that D.A.R.E. is an acronym for "Drug Abuse Resistance Education" and is the name for a law enforcement program designed to educate students about the dangers of drug consumption and to forge relationships between law enforcement officers and students.

dent, some of which supported Ulichny's actions and some of which criticized the same. (PFOF at ¶ 22; DR at ¶ 22.) A petition began circulating in the community requesting an investigation into the handling of the incident. (Id.) Nevertheless, from the day the incident happened and throughout November of 1997, Flynn publicly supported Ulichny's actions, and some of his statements of support were quoted in local newspaper stories stemming from the incident. (PFOF at ¶ 23.)

On November 6, 1997, while the public fallout from the "wedgie" incident was still developing, Flynn gave Ulichny her first quarterly progress report in accordance with her assistance plan, discussed *supra.* (DFOF at ¶ 55; PR at ¶ 55.) It was quite positive. (Flynn Aff., Ex. S.) Flynn summarized his report by stating that "Susan has demonstrated good performance in her role as Principal" and by noting "her willingness, with results, to actively participate in the improvement process thrust upon her by the Board and the Superintendent." (Id.) The positive report was consistent with the results of a staff survey conducted by an outside consultant during the month of November, 1997 at the School District's request. (Ulichny Aff., Ex. 3.) The survey report noted an improvement in school climate in terms of communication, trust and reduced gossip. (Id.) The report cited "improvement in the relationship between Ms. Ulichny and the professional teaching staff" and noted that, while "some distrust remain[ed]," it was "on a subdued level since the 1996–97 school year." (Id.)

On December 12, 1997, Flynn gave Ulichny her second quarterly progress report. (DFOF at ¶ 57; PR at ¶ 57.) It was also quite positive. (Flynn Aff., Ex. S.) Flynn summarized his report by stating that "Susan continues to improve as a principal.... Her improvement orientation, her introspection, are exemplary." (Id.) Three days after this report, Flynn submitted a confidential report to the School Board regarding Ulichny's contract

status and the progress of her assistance plan. (Ulichny Aff., Ex. 35.) The report was designed to assist the Board in making its decision regarding the possible renewal of Ulichny's contract, a decision which had to be made no later than January, 1998.(Id.) The report listed specific areas of strength, areas of improvement, and areas for future growth. (Id.) Overall, the report was very positive and painted a picture of a principal and a school that had substantially improved. (Id.) Flynn concluded by recommending that the School Board issue Ulichny a 2–year contract:

> Mrs. Ulichny has earned a 2 year contract. My impression was that I started with a first year principal. Improvement has been substantial and her improvement orientation will continue to help her improve. Her performance has been good this year, she has the potential to improve and has served the district well.
>
> .... Many times there currently exists with the employees and the community a propensity to make Susan the issue, instead of children being the issue. The support of a 2 year contract reduces that propensity.

(Id.)

On December 15th, the Board voted—in closed session—to issue a two year contract to Ulichny, which would cover the 1998–99 and 1999–2000 school years. (PFOF at ¶ 30.) That same day, an article ran in a local newspaper stating that the School Board intended to conduct a review at its December 15th meeting of the manner in which the "wedgie" incident was handled, although Flynn was again noted as having said the matter was handled appropriately. (Ulichny Aff., Ex. 18.) The story indicated that a School Board member had urged the reporter who wrote the story to hold off printing the same until after the December 15th Board meeting took place, stating that the furor over the incident had died down and she was concerned that another story "would make it flare up again." (Id.) Interestingly, the

subject of Ulichny's possible contract renewal was never discussed in the news story, suggesting that the same had been kept confidential. (Id.) A second story ran on January 19, 1998, disclosing that the School Board planned to meet in closed session on January 20th to question the administrators, students, parents and sheriff's personnel involved in the "wedgie" incident. (Ulichny Aff. Ex. 19; PFOF at ¶¶ 32–33.) During that meeting, some of the parents criticized Ulichny's actions and some of the parents supported them, but Flynn again spoke in strong support of Ulichny's actions, stating that "Susan ... had my 100 percent support [...] [a]nd has it to this day." (PFOF at ¶¶ 33–38.)

Soon thereafter, some of the parents within the School District learned of Ulichny's contract renewal. In late January or early February, 1998, Jeffrey Musche ("Musche"), a parent of a child in the School District, complained that the Board violated Wisconsin's Open Meetings Law, Wis. Stat. § 19.81 *et. seq.*, by not informing the public or voting in open session regarding Ulichny's contract renewal. (DFOF at ¶ 63; PR at ¶ 63; Ulichny Aff., Ex. 20.) The complaint was apparently referred to Waukesha County District Attorney Paul Bucher, who was quoted in a February 4, 1998 newspaper article as saying that he was investigating the matter because the closed session and vote "appear[ed] to be a violation of the open meetings law." (PFOF at ¶ 40.) After Flynn discussed the matter with Bucher, the Board met on February 16, 1998 and apparently voted to rescind the prior vote on Ulichny's contract.[8] (DFOF at ¶ 65; PR at ¶ 65.) The Board initially planned to conduct another vote on the contract that night in open session, but the vote was delayed until February 19, 1998, ostensibly to allow the Board to consult with legal counsel. (Ulichny Aff., Ex. 26.) According to newspaper reports, however, the vote was delayed because a large group of parents attended the meeting and voiced their strong objections against renewing Ulichny's contract. (PFOF at ¶ 42; Ulichny Aff. Exs. 22, 23 & 25.) Some parents also criticized Flynn's evaluation of Ulichny, as well as various other alleged problems within the School District, including low teacher morale, teacher turnover, student achievement, an unsettled teachers' contract, delayed textbooks, and students' academic placement upon entering the local high school. (PFOF at ¶ 44; Ulichny Aff., Ex. 25.) Newspaper reports following the meeting paraphrased and/or quoted Flynn as taking the following positions with respect to Ulichny and/or the other issues raised:

> Superintendent Mark Flynn had completed Ulichny's evaluation. He has steadfastly upheld her decision to call law enforcement to the school.

> \* \* \* \* \* \*

> [Flynn] went on to say that he shared some of the concerns raised by the residents, including: teacher morale, lack of trust, the public's regard for the administration, an unsettled teachers' contract, teachers' regard for the board and teacher turnover.

> [Flynn] said there is a misperception as to why some teachers have left the district. The reasons are stated in correspondence the district has received from the teachers. He did not elaborate on the reasons.

> Flynn also addressed concerns that had been raised about textbooks, students' placement at Arrowhead High School and curriculum....

---

**8.** Ulichny claims the Board cannot simply "rescind" a contract it enters into, (PR at ¶ 65), but that is not an accurate description of what happened. The Board's prior vote only authorized the District to enter into a two-year contract with Ulichny "with salary and contract provisions to be determined at a later date." (DFOF at ¶ 62; PR at ¶ 62.) The vote did not create a contract; that was to be—as in the past—a separate document executed by the parties and containing all of the relevant terms of the deal.

[Flynn] added he is looking at providing time for teachers to talk to each other about educational strategies....

(Ulichny Aff., Ex. 25.)

Asked about parents' complaints, Superintendent Mark Flynn said: "I'm not going to substantiate or deny them. It was these parents' opportunity to state their perceptions and that's what they did."

Parents of the youths said administrators overreacted by calling police. But Flynn said the district acted appropriately.

(Ulichny Aff., Ex. 23.) These articles also quoted School Board President Isabel Brown as stating that, although a number of parents at the meeting demanded Ulichny's removal, "[p]robably we have more people who want her to stay than want her out." · (Id.)

The Board met again on February 19, 1998 and discussed the question of renewing Ulichny's contract in open session. (DFOF at ¶ 76; PR at ¶ 76.) Because the deadline for providing Ulichny preliminary notice of non-renewal under Wis. Stat. § 118.24 had passed, the Board had little choice but to renew Ulichny's contract. (DFOF at ¶ 77; PR at ¶ 77; PFOF at ¶ 56.) Consequently, a majority of the Board voted "to continue Susan Ulichny's employment with the Merton Community School District with a revised job title and description beginning with the 1998–99 school year." (PFOF at ¶ 58.) The next day, February 20, 1998, Flynn sent a memo to all district employees stating, in pertinent part:

The school board was advised by legal counsel of the fact that statutory timelines provided for the renewal of the employment contract for Ms. Ulichny whether the board acted or not. Given that advice, the board acted to continue Ms. Ulichny's employment contract with the Merton Community School District for the next 2 years with a revised job title and description, beginning with the 98–99 school year.

The board, after lengthy discussion, took this action in response to: contractual obligations, statutory requirements, staff input, board input, parent input, and taxpayer interest. The board, in the coming months, will approve revised job duties for administrative staff that are responsive to the input received from staff and parents.

(Ulichny Aff., Ex. 36.) The same basic information was sent to all the parents of students in Merton. (Id., Ex. 37.)

In addition to the District's own publicized statements, the *Milwaukee Journal Sentinel* publicized the Board's actions, reporting that the Board "could strip [Ulichny] of her duties as principal at the end of the school year" and quoting Board President Brown as stating that Ulichny's revised job duties "could lead to her not being principal," although Brown pointed out that nothing firm had been decided yet. (Ulichny Aff., Ex. 38.) Other sections of the article quoted Brown and Flynn as follows:

[Ulichny's] new duties likely will include some of the areas [she] now handles, such as curriculum and technology, Brown said.

"She will be the principal for the balance of this year," Brown said. "We're hoping that the rest of the year goes well ... We will be working with Susan and the staff to see where her abilities fit in best."

\* \* \* \* \* \*

Superintendent Mark Flynn said Friday that he understands parents remain upset about the contract extension. But he said the board's decision took into account both negative and positive comments the district received about Ulichny, the district's contractual obligations, a responsibility to taxpayers, and Ulichny's 2½ years of employment in Merton Schools.

"When the job responsibilities are finalized, I think people will be able to readi-

ly see the board is responding in the best interests of the children of Merton schools," Flynn said. "This is the start of a process of change."

(Id.) Another article, appearing in the *Lake Country Reporter,* reported that Ulichny would be allowed to stay on at Merton Intermediate school for at least two more years, "but she may no longer be principal of the school." (Ulichny Aff., Ex. 39.) The article quoted and/or paraphrased Flynn as follows:

"There will be some shifting of job responsibilities," said superintendent Mark Flynn. "She could feasibly not be the principal of Merton Intermediate School."

\* \* \* \* \* \*

"I'm confident we can put together a plan that will work for the children and be responsive to their needs," said Flynn, adding that the Board was trying to accommodate the needs of everybody involved.

"The board feels that the plan is responsive to the concerns of the board, staff and parents," he said. "The division of duties is something that will reflect the concerns that the community and staff indicated they wanted."

Flynn said neither he nor the board had decided on any specific changes to Ulichny's job description.

\* \* \* \* \* \*

Throughout the controversy, Flynn and the school board have stood behind their principal, but at a raucous meeting last week a number of parents spoke out criticizing [Ulichny's] conduct and asking for her dismissal.

\* \* \* \* \* \*

[Flynn] did not describe the board as having been "forced" to keep Ulichny on, but did say that "the time had passed" when the board could have asked her to leave.

(Id.)

During this time frame, on or around February 17, 1998, Vicky J. Wedig ("Wedig") of the Waukesha Freeman submitted an "open records" request under Wisconsin's Public Records Law, Wis. Stat. § 19.31, *et. seq.,* seeking "copies of letters parents have written to the Merton School Board and administrators regarding Merton Intermediate School Principal Susan Kirchen–Ulichny." (DFOF at ¶ 74; PR at ¶ 74; Flynn Aff., Ex. Z.) Roughly one week later, on February 25, 1998, Michael B. Johnson ("Johnson") of the Milwaukee Journal Sentinel submitted another "open records" request, seeking "copies of all documents ... related to the employment and contract of ... Susan Ulichny," including, but not limited to, the following: (1) Any letters written by parents and others in support of Ulichny; (2) any letters written by parents and others against Ulichny; (3) copies of letters and petitions related to the October attack on the playground; (4) copies of any responses from either the School Board or district administrators in response to these letters, petitions or other documents; (5) a copy of Ulichny's contract and her job description as well as goals spelled out by the School Board and district administrator for her to meet; and (6) copies of any letters of commendation or reprimand that have been placed in Ulichny's file. (Flynn Aff., Ex. DD.) The School District informed Ulichny and/or her counsel of the open records requests. (PFOF at ¶ 63.) Ulichny, through her counsel, asked the District not to release the letters from the parents, stating that Flynn himself acknowledged that the letters contained falsehoods and thus it was clear that releasing the information would harm Ulichny's reputation.[9] (Westerhof Aff., Ex. 75.) On March 10, 1998, the District informed Ulichny that it had de-

---

9. Ulichny also argued that many of the parents who wrote negative letters had not followed the District's "complaint procedure" and therefore she had not had an opportunity to respond to those letters. (Westerhof Aff., Ex. 75.)

cided to make the requested documents available to the inquiring press, subject to conditions including redaction of student names and information, and the opportunity for the authors and Ulichny to inspect the documents pursuant to *Woznicki v. Erickson*, 202 Wis.2d 178, 549 N.W.2d 699 (Wis.1996), and to seek circuit court review of the District's decision.[10] (DFOF at ¶ 85; PR at ¶ 85.) The District gave Ulichny until 2:00 p.m. on March 18, 1998 to seek circuit court review of its decision, at which time—if no such action was filed— the District intended to turn the records over to the *Milwaukee Journal Sentinel* and the *Waukesha Freeman.* (DFOF at ¶ 86; PR at ¶ 86.) The next day, March 11, 1998, the District sent copies of the documents it intended to produce to Ulichny's counsel. (DFOF at ¶ 87; PR at ¶ 87.) Ulichny and her counsel responded by stating that, to the extent that the District believed that certain documents were inaccurate, it had an affirmative obligation to inform the newspapers of those inaccuracies at the time of disclosure. (Westerhof Aff., Ex. 77.) In addition, Ulichny stated there were other documents responsive to the requests which were not among those listed to be produced and which she would produce herself if the District did not do so. (Id.) The District refused to produce these additional documents, taking the position that such documents did not fall within the scope of the requests. (Westerhoff Aff., Ex. 78.) In addition, the District refused to comment one way or another on the veracity of any of the documents produced, taking the position that the open records law does not impose such an obli-

gation and, in any event, the District had no official belief or opinion in this regard to communicate.[11] (Id.) In the end, Ulichny did not seek judicial review of the District's decision to release the documents. (DFOF at ¶ 92; PR at ¶ 92.)

Meanwhile, local newspapers continued to report on the situation. On March 17, 1998, the *Waukesha Freeman* paraphrased Flynn as stating that the Board "may revise Ulichny's job title and will reassign some of her traditional principal duties to other administrators, . . . ." (Ulichny Aff., Ex. 44.) In the same article, Timothy O'Neill—at the time a non-incumbent candidate for the Merton School Board—was quoted as stating his opinion that "[Ulichny's] role should be one that does not interact with the kids" and his understanding that parents had accused Ulichny of " 'bull[ying]' kids" and "lie[ing]." (Id.) The article also paraphrased Flynn as saying that "it would be presumptuous to say whether Ulichny's revised role will exclude interaction with children." (Id.) A March 19, 1998 article by the *Milwaukee Journal Sentinel* noted that Ulichny "would have a new job title and job duties that could lead to her not being principal this fall." (Ulichny Aff., Ex. 45.) The article also paraphrased Board President Brown as stating that "Ulichny . . . has been put in a tough position because people told her there needed to be more discipline." (Id.) And a March 23, 1998 article in the *Waukesha Freeman* again noted that the Board "plans to reassign some of [Ulichny's] duties' and reiterated O'Neill's opinion that

10. The *Woznicki* decision held that public employment records such as those involved here are not exempt from the open records law, but required the custodian of such records to (1) weigh the competing interests involved and determine whether permitting inspection would result in harm to the public interest that outweighs the public's interest in inspecting the documents, and (2) if no such harm is involved, the records may be released, but the custodian must first notify any individual(s) whose privacy or reputational interests are implicated thereby that the records are going to be released, and then the custodian must

allow said individual(s) a reasonable time to seek judicial review of the decision to release the records. *Woznicki,* 202 Wis.2d at 191– 193, 549 N.W.2d 699.

11. The District noted that, while certain board members or administrators might have their own personal opinions concerning the accuracy of some of the parents' letters, those opinions did not represent an official position of the School District and therefore could not be communicated as such. (Id.)

Ulichny should be given duties that do not involve interaction with kids." (Ulichny Aff., Ex. 46.)

On March 25, 1998, Ulichny accepted her 1998–2000 contract, the relevant terms of which were identical to her prior contracts. (Flynn Aff., Ex. KK.) In or around that same time frame, Flynn asked Ulichny to assist him in drafting her revised job duties. (PFOF at ¶ 75; DR at ¶ 75.) Ulichny essentially refused, stating that she could perform all of her current job duties. (Id.) Flynn then drafted the proposed changes himself, and he provided a copy of his "proposed job description and title changes" to Ulichny three days before they were to be presented to the School Board at a scheduled April 20, 1998 Board meeting. (PFOF at ¶¶ 78, 80; DR at ¶¶ 76–81.) By a letter of that same date, Ulichny—through her counsel—objected to the proposed changes as violating her contract, the Wisconsin statutes, and her due process rights. (Westerhof Aff., Ex. 81.) Ulichny also stated that any public release of the proposed changes would violate her alleged due process/liberty interest in her reputation, and therefore she urged the District to consider Flynn's proposal in closed session and not release any documents related thereto to the public. (Id.) The District did not respond to Ulichny's letter. (PFOF at ¶ 89; DR at ¶¶ 84–92.) The April 20, 1998 Board meeting was conducted in open session—with two reporters and several community members present—and the proposed changes were described by Flynn and "briefly discussed" by the Board. (Ulichny Aff., Ex. 54.) Under the proposed changes, Flynn was to become the Intermediate School Principal in addition to being the District Administrator. (PFOF at ¶ 92; DR at ¶¶ 84–92; Ulichny Aff., Exs. 52, 56.) Mike Budisch, who was previously the K–3 Primary School Principal, would serve as the K–5 Principal. (Id.) Ulichny would "assist" Flynn in the administration of the Intermediate School, while retaining her salary and the title of School Principal. (Id.) She would lose specific authority to perform

many of the duties which she had performed previously—including (but not necessarily limited to), the following: (1) teacher and support staff supervision and evaluation, (2) student discipline, (3) bus referrals, (4) PTA duties, and (5) advisory committee duties. (Id.) Most of these duties were to be transferred to Flynn, while others were transferred to Budisch. (Id.) The proposed changes, however, were not formally adopted by the Board. (DFOF at ¶ 102; PR at ¶ 102.) Instead, the changes were set aside for a "second reading" and a vote at a future Board meeting. (DFOF at ¶ 101; PR at ¶ 101.) Nevertheless, after the April 20th Board meeting, articles in local newspapers reported the proposed changes and generally stated that Ulichny was being stripped of her supervisory duties over teachers and students. (Ulichny Aff., Exs. 55–57.)

The Board scheduled a meeting for May 18, 1998 to vote on the proposed job changes. (PFOF at ¶ 97; DR at ¶ 97.) Before this meeting, on May 15, 1998, Ulichny served a Notice of Claim and Claim on the Clerk of the Merton School Board, which generally described the circumstances of her claim and provided an itemized statement of the relief sought. (Id.) In response, the Board removed the scheduled vote on the proposed job changes from its formal Agenda for the May 18th meeting. (PFOF at ¶ 99.) Instead, the Board went into closed session "to confer with legal counsel and receive advice concerning strategy to be adopted with respect to litigation which is likely to occur." (PFOF at ¶ 100.) The District subsequently released a copy of the Notice of Claim and Claim to the *Milwaukee Journal Sentinel, Waukesha Freeman* and *Lake Country Reporter* without providing Ulichny with notice or an opportunity to object. (PFOF at ¶ 98.) Stories regarding the Notice of Claim and Claim ran in all three papers, and also in the *Wisconsin State Journal.*

Beginning in or around this time, Flynn began sending memos to Ulichny criticizing what Flynn viewed as various lapses in her duties or performance. (PFOF at ¶¶ 108–109.) Ulichny received such memos on May 12, May 15, May 22, June 1, June 7, August 3 and August 11, 1998.(Id.) Ulichny cannot recall ever receiving such critical memos from Flynn in the past. (Id.) Moreover, Flynn did not conduct the March 1 and June 15 quarterly progress reports called for by the assistance plan put in place when Ulichny was re-hired for the 1997–98 school year. (PFOF at ¶ 110.) Flynn did prepare a year-end evaluation of Ulichny's performance, however, dated July 7, 1998. (Id.; Flynn Aff., Ex. PP.) He did not share or discuss this evaluation with Ulichny at the time. (PFOF at ¶ 110.) The evaluation cited regression in many "critical areas" since the improvements that were noted in Ulichny's first two quarterly progress reports, and concluded that such regression, "if not reversed,. will result in a short-term, unsuccessful employment relationship with the Merton Community Schools." (Flynn Aff., Ex. PP.)

In a memo to Ulichny dated August 3, 1998, Flynn set forth certain "[c]oncrete changes" which were to take effect for the upcoming 1998–99 school year. (Flynn Aff., Ex. QQ.) Under the category of "Visibility/Supervision," the memo set forth a schedule which required Ulichny to be on the playground for a half hour before school, in the lunch room and on the playground for all three lunch periods of the Intermediate School, in the halls when the 7th and 8th graders changed classes, and in the halls and outside school during school dismissal and bus departure. (Id.) Under "Employee Supervision," the memo stated that all teachers would be supervised and evaluated directly by Flynn, and that Ulichny would "assist with scheduling issues" and would be "assigned specific teacher evaluations . . . . [to] participate in." (Id.) Under "Student Discipline," the memo stated that Ulichny would handle student discipline in grades 4–6, while Flynn would handle discipline in grades 7–8 "and all suspension/law enforcement situations." (Id.) Under "School/Community Newsletter," the memo stated that Ulichny and Flynn would work together to "set a schedule and contents" for the school newsletter. (Id.) Under "NCA and Curriculum Evaluation," the memo stated that Ulichny would "provide the administrative leadership in these 2 areas." (Id.) Under "Intermediate Advisory Council," the memo stated that Flynn would work directly with the advisory council, and that Ulichny "may participate if [Flynn] deem[ed] it appropriate, but not in the beginning." (Id.) Under "Support," the memo stated that Ulichny was "expected to support and carry out in spirit and letter, the positions, policies, and directions of the school board and superintendent . . . [a]greement with the decision is not relevant." (Id.)

On August 5, 1998, Flynn and Ulichny—along with their respective counsel—met to discuss her changed job responsibilities. (DFOF at ¶ 108; PR at ¶ 108.) Flynn produced notes of the meeting. (Flynn Aff., Ex. RR.) According to those notes, Flynn and/or District counsel raised issues concerning Ulichny's job performance, including her failure to progress in inspiring trust, lack of attendance at special events, lack of judgment, and noncompliance with directives. (Id.; DFOF at ¶ 109; PR at ¶ 109.) Some of the more important changes listed in the August 3rd memo were also discussed. For example, in the area of "Student Discipline," Flynn stated that he would assume a "mentoring role on a temporary basis in grades 7–8" and that Ulichny would handle grades 4–6 "except special education and suspensions." (Flynn Aff., Ex. RR.) Flynn described his "mentoring role" as "[himself] handling some cases, others handled as a team, others with consultation, and some delegated to [Ulichny]," all at Flynn's discretion. (Id.) In the area of "Employee Supervision," Flynn stated that he would again assume a "mentoring role" with re-

gard to "the supervision of all employees at the Intermediate School, for day-to-day purposes as well as evaluation purposes." (Id.) Flynn's "mentoring role" was again described as "[Flynn] exclusively handling some matters/cases, others handled as a team, others with consultation and some delegated to [Ulichny]," all at Flynn's discretion. (Id.) Flynn explained that these changes "were being taken because the building and its morale were viewed to be in crisis, and some modeling or teaching for [Ulichny] was needed in light of the situation after [her] three years in the district." (Id.) When asked by Ulichny's counsel what Flynn wanted Ulichny to do if she disagreed with him or the Board on a given matter, Flynn stated that he would prefer that Ulichny express her disagreement to him directly and carry out the particular directive to the best of her ability. (Id.) Flynn also stated that "[i]f disagreements mount with superordinates, and are not tolerable in the eyes of the middle level manager (principal), they have no choice but to leave and assume a middle level management or superintendent role elsewhere." [12] (Id.) Ulichny's attorney closed the meeting by stating that the proposed changes "appeared to be a system where [Flynn] was the Principal and [Ulichny] ... an Assistant Principal," and further that he "was not really confident things would work out this way." (Id.)

The parties dispute the specifics of what actually occurred once the 1998–99 school year began, so the Court sets forth the following facts in the light most favorable to Ulichny. At the beginning of the school year, Flynn moved his office into the Intermediate School, directly across the hall from Ulichny's office. (PFOF at ¶ 122.) Flynn presided over the first faculty meeting on August 21st, during which he told staff that he would be handling all discipline at the Intermediate School and that he would perform all teacher supervision and evaluations, though he might delegate

some of these duties to Ulichny at a later date. (PFOF at ¶ 123.) A subsequent memo to school staff stated that staff members could approach either himself or Ulichny with questions or concerns, but also indicated that he was their "direct supervisor." (Ulichny Aff., Ex. 71.) Going forward, Flynn assumed the main duties of School Principal. (PFOF at ¶ 125.) For example, he hired a teacher for the school without conferring with Ulichny. (Id.) He conducted staff meetings without notifying Ulichny of the meetings or advising her afterward of what was accomplished. (Id.) He selected mentors for new teachers without involving Ulichny. (Id.) He dealt directly with staff, parents and students regarding day-to-day issues at the school; Ulichny had to refer queries from parents and staff to Flynn. (PFOF at ¶ 127.) Ulichny's playground, lunch room, hallway and bus monitoring duties accounted for almost four hours of her work day. (PFOF at ¶ 128.) It is unclear what specific duties filled in the remaining hours. However, Ulichny's work report for the week of August 28, 1998 indicates that she also interviewed candidates for the positions of substitute teacher and "EEN aide," met with teachers regarding "study hall," "enrichment" and "TAG," met with the teacher assistants, visited all classrooms, met several times with Flynn, and participated in a meeting regarding the records of new students at the school. (Flynn Aff., Ex. SS.) The same report indicated a listing of events for the week of August 31—September 4, 1998, which included an administrative meeting, a sixth grade back to school night, a meeting of the Advisory Committee, followed by two vacation days (presumably the Labor Day holiday). (Id.)

Ulichny worked only four more days following the Labor Day holiday. On September 10, 1998, a student questioned Ulichny as to why she was still working at the school if she was no longer the princi-

---

**12.** Ulichny claims that, on at least two other occasions, Flynn told her she should get a job in another school district. (PFOF at ¶ 119.) The District does not dispute this claim.

pal. (PFOF at ¶ 131.) At the end of that same day, Ulichny asked Flynn whether the current division of responsibilities would continue. (PFOF at ¶ 132.) Flynn replied that they would. (Id.) Ulichny called in sick the next day. (PFOF at ¶ 133.) At Flynn's request, Ulichny produced a physician's note—dated September 21, 1998—which advised that Ulichny was suffering from an unspecified "medical illness" and that she was "to remain off work until [her] condition is improved." (PFOF at ¶ 134; Flynn Aff., Ex. UU.) Ulichny was officially absent from work due to illness from September 11—November 19, 1998. (DFOF at ¶ 113; PR at ¶ 113.) On September 30, 1998, Flynn sent Ulichny forms to apply for a medical leave of absence. (DFOF at ¶ 116; PR at ¶ 116.) Ulichny responded by stating that she was not requesting leave under the Family Medical Leave Act. (DFOF at ¶ 117; PR at ¶ 117.) On October 19, 1998, Ulichny's lawyer sent a letter to the District alleging that the District had constructively terminated Ulichny's employment as Principal and her corresponding contract. (Flynn Aff., Ex. XX.) Enclosed was a draft of the complaint for the lawsuit Ulichny intended to file. (Id.) This lawsuit was filed one month later.

## II

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Summary judgment is no longer a disfavored remedy. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.*, at 327, 106 S.Ct. 2548. It "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *United Food and Commercial Workers Union Local No. 88 v. Middendorf Meat Co.*, 794 F.Supp. 328, 330 (E.D.Mo.1992). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While a *material* fact is one that is "outcome determinative under the governing law", *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir.1990), a *genuine* issue as to that material fact is raised only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

The question whether a material issue of fact is *genuine* necessarily requires "some quantitative determination of sufficiency of the evidence." Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court*, 116 F.R.D. 183, 186 (1987). "Of course, a court still cannot resolve factual disputes that could go to a jury at trial, ... [b]ut no longer need the trial court leave every sufficiency issue for trial or a later directed verdict motion." *Id.* "A district judge faced with [a summary judgment motion] must decide, subject of course to plenary appellate review, whether the state of the evidence is such that, if the case were tried tomorrow, the

plaintiff would have a fair chance of obtaining a verdict. If not, the motion should be granted and the case dismissed." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572–73 (7th Cir.1989) (citations omitted). Thus, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corporation*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[A] party must produce 'specific facts showing that there remains a genuine issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed." *Branson v. Price River Coal Company*, 853 F.2d 768, 771–72 (10th Cir.1988). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. Nor may "[a] party to a lawsuit ... ward off summary judgment with an affidavit or deposition based on rumor or conjecture. 'Supporting and opposing affidavits shall be made on personal knowledge, ....'" *Palucki*, 879 F.2d at 1572 (7th Cir.1989). Such principles insure that summary judgment is utilized "when it can be shown that a trial would serve no useful purpose." *Windham v. Wyeth Laboratories, Inc.*, 786 F.Supp. 607, 610 (S.D.Miss.1992).

### III

Ulichny raises several federal and state law claims in this suit, but the Court focuses first (and exclusively) on the federal claims as they provide the basis for the Court's jurisdiction. Construed favorably, Ulichny's pleadings allege that defendants' actions violated the 14th Amendment to the Federal Constitution by depriving her of two identifiable property interests without due process of law: (1) Her right to perform the duties typically assigned to a public school principal in Wisconsin; and (2) her right to public employment *per se*, with a corresponding right not to be constructively discharged from her public employment. Ulichny also claims that defendants' actions violated the 14th Amendment by depriving her of a liberty interest in her occupation without due process of law. Finally, Ulichny claims the defendants' conspired to deprive her of the foregoing liberty and property interests. On summary judgment defendants argue, *inter alia*, that Ulichny has no property right to perform the duties typically assigned to a public school principal, she was not constructively discharged but rather voluntarily resigned, neither the School District nor any individual Board member or administrator publicly communicated any stigmatizing information concerning Ulichny, the individual defendants enjoy qualified immunity from liability for their actions, and there is no evidence of a conspiracy. The Court addresses these issues as follows.

### A. DENIAL OF PROPERTY INTERESTS

The 14th Amendment to the Federal Constitution provides that no State may "deprive any person of life, liberty, or property, without due process of law...." It is important to keep in mind, however, that "[p]roperty interests ... are not created by the Constitution." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law— rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* Thus, property interests are most frequently found to arise from rights created by state statutes, state or municipal regulations or ordinances, and contracts with public entities (especially employment contracts with public entities). But these are not the exclusive sources of property interests. "[P]roperty interests subject to procedural due process protection are not limited by a few rigid, technical forms." *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694,

33 L.Ed.2d 570 (1972). "Rather, 'property' denotes a broad range of interests that are secured by 'existing rules or understandings.'" *Id.* "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Id.* For example, a property interest need not be based on an explicit statutory or contractual provision. Such explicit provisions "may be supplemented by other agreements implied from 'the promisor's words and conduct in the light of the surrounding circumstances.'" *Id.* at 602, 92 S.Ct. 2694. All that said,

> [t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Roth,* 408 U.S. at 577, 92 S.Ct. 2701.

## 1. Duties of Public School Principal

Ulichny argues that she had a property interest in performing all of the duties normally expected of a school principal in Wisconsin. She bases this claim on certain language in her contract and the Wisconsin statutes, as well as an alleged "mutual understanding" between herself and the School District. The Court disagrees.

█ Ulichny cites two provisions in her contract as giving rise to a property interest in performing the normal duties of a school principal. The first, quoted *supra,* obligated Ulichny "to devote full time to the duties and responsibilities normally expected of the Principal's position during the term of this contract, . . . ." The second, also quoted *supra,* obligated Ulichny "to perform at a professional level of competence the services, duties and obligations required by the laws of the State of Wis-

consin and the rules, regulations and policies of the Board . . . ." Consistent with the latter provision, Ulichny turns to various Wisconsin statutes to flesh out the "normal" and/or "required" duties of a school principal. The statutes she points to are a hodgepodge of very specific bequests of authority and/or duties governing very specific situations, *i.e.,* the removal of a pupil from class, the reporting of indigent children, the suspension of a pupil, and the handling/reporting of communicable diseases. *See,* Wis. Stats. §§ 118.18, 188.17, 120.13(1)(b) & 252.21.[13] Such isolated provisions hardly set forth or give rise to a property interest in performing the broad range of "normal" or "required" duties Ulichny alleges she was entitled to perform as principal. This is particularly so when one considers the single statutory provision that actually does address the general duties of a school principal. That statute leaves the specification and assignment of such duties to the discretion of the district administrator employed by a particular school district:

> (3) The principal shall perform such administrative and instructional leadership responsibilities as are assigned by the district administrator subject to the rules, regulations and approval of the school board.

Wis. Stat. § 118.24(3). Thus, the Wisconsin statutes do not support the existence of a principal's property interest in performing specific duties. Neither does the contract's reference to "the duties and responsibilities normally expected of the Principal's position. . . ." This provision, placed within the "RESPONSIBILITIES" section of the statute, simply sets forth what Ulichny's obligations were under the contract. It does not place a reciprocal obligation on the Board or prevent it—or the district administrator acting with the Board's authority—from determining what

---

**13.** Ulichny also cites Wis. Stat. § 119.16(6), regarding a principal's general supervisory authority as custodian of all school premises. However, that statute only applies to princi- pals in a "first class city school system," which means the City of Milwaukee Public School System. The statute, therefore, has no application to Ulichny's case or situation.

the precise nature of Ulichny's duties would be. This interpretation is consistent with Judge Reynolds' decision in *Terry v. Woods,* 803 F.Supp. 1519 (E.D.Wis. 1992). There, a Wisconsin school principal who had been temporarily suspended (with pay) tried to argue that his contract created a property interest in going to work and performing his duties as principal. Judge Reynolds disagreed, explaining that the explication of a principal's duties in a contract did not create such an interest:

> The court concludes that the circumstances surrounding Terry's employment do not indicate that he was "entitled" to go to work. Most importantly, Terry's contract cannot be read as conferring any such entitlement. The consideration flowing to him under the contract is limited to his salary and certain fringe benefits of an economic nature. Although both the contract and state law require Terry to perform certain duties, that requirement does not directly impose any obligation upon [the School District]. Terry may have reasonably expected that he would be able to do his work, but an expectation by itself does not create a property interest.

*Terry, supra,* at 1524. This interpretation of the contract is further made clear by two other provisions therein. The first, cited and relied upon by Ulichny, *supra,* requires Ulichny "to perform ... the services, duties and obligations required by ... the rules, regulations and policies of the Board...." The second provision is found within the "RESPONSIBILITIES" section of the contract—the only such provision purporting to set forth a Board obligation—and states that "[t]he Board shall provide the Principal with a written job description of [her] services, duties and obligations." These two provisions certainly imply that the Board has the authority and discretion to determine the specific nature and scope of Ulichny's job duties, especially when read in conjunction with the similar discretion accorded school districts and/or their administrators under § 118.24(3).[14]

■ Finding little support for a property interest in the express words of her contract or the Wisconsin statutes, Ulichny tries to create a dispute of fact through the submission of an affidavit from Charles Hilston ("Hilston"), a proposed expert witness in the operation of Wisconsin school districts.[15] Hilston offers a number of opinions, but relevant here are: (1) His opinion that the normal and/or primary duties of a school principal in Wisconsin include supervising and evaluating professional and support staff, enforcing the discipline of students, recruiting, screening, hiring, training and assigning professional and support staff, and conducting staff meetings; and (2) his opinion that when a principal and a school district in Wisconsin enter into a contract, it is understood that the principal has the right to perform the latter duties and the school district cannot simply reassign the principal to a lesser position and/or lesser duties. (Hilston Aff at ¶¶ 22–23; Plaintiff's Brief in Opposition at 64–66.) Ulichny argues that Hilston's affidavit suggests the existence of a "mutually explicit understanding" between school principals and school districts in Wisconsin that a principal has a right to perform the normal duties of a school principal (as described by Hilston). The Court does not attach such significance to Hil-

---

14. Ulichny tries to distinguish *Terry* on the grounds that her contract, unlike the contract in *Terry,* specifically stated that the Board "does hereby employ [Ulichny] in the position of District Principal." (Ulichny Aff., Ex. 2.) The Court fails to see the significance of this distinction in light of the fact that neither the contract nor the Wisconsin statutes define the specific duties of a "district principal" and instead leave the determination of such duties to the respective and independent discretion of school boards (and district administrators) across Wisconsin.

15. Defendants moved to strike Hilston's affidavit as inappropriate and/or unsupported expert testimony, but the Court will consider the same for purposes of the summary judgment motion.

**1030**

ston's affidavit. First, the affidavit asserts the existence of an implicit understanding that runs contrary to both the express language of the contract and the relevant Wisconsin statute. The contract and § 118.24(3) grant the School Board and Flynn (as District Administrator) broad discretion to determine the responsibilities and duties of their various principals and required Ulichny to do whatever the Board and/or Flynn told her to do in the exercise of that discretion. Hilston's testimony simply ignores or obfuscates these express provisions and asserts in their place an unwritten and unspoken "understanding" between, not just these particular litigants, but principals and school districts across the State of Wisconsin. The Court will not allow the contract and governing statute to be rewritten in this fashion. Second, even if the Court were inclined to allow Hilston's testimony to call into question the express language of the contract and § 118.24(3), it would only do so on the basis of strong factual evidence supporting Hilston's opinion that the alleged "understanding" actually exists. There is no such evidence in this record. Hilston's affidavit does not identify or state that he reviewed or compiled any historical data concerning the uniformity of the duties assigned to school principals across Wisconsin, or more importantly, the frequency with which Wisconsin school principals are reassigned to lesser positions and/or their duties decreased. Certainly such information is obtainable, or if it is not, then what factual evidence supports Hilston's opinions? His general experience in the industry? While the Court acknowledges that Hilston's experience in the industry is substantial, such experience alone is not enough to allow a reasonable jury to conclude that Ulichny's contract and § 118.24(3) do not mean what they seem to say.

Finally, the Court's decision is consistent with the majority of courts considering the issue and holding that a public employee has no property interest in a particular assignment or job duty, as op-

posed to his or her employment *per se. See, Lewandowski v. Two Rivers Public School District,* 711 F.Supp. 1486, 1495–96 (E.D.Wis.1989)(and cases cited therein). The few exceptions to this rule are cases involving an express contractual or statutory provision stating that the class of employee at issue could not be demoted or reassigned except under specified circumstances and procedures. *See e.g., Hatcher v, Board of Public Education and Orphanage for Bibb County,* 809 F.2d 1546, 1550–52 (11th Cir.1987). There is no such provision or statute here. Moreover, the 7th Circuit has repeatedly expressed its doubts as to whether a transfer, reassignment or even demotion of a public employee that involves no diminution in salary can ever give rise to a 14th Amendment claim. *See, Parrett v. City of Connersville,* 737 F.2d 690, 693 (7th Cir.1984); *Greenberg v. Kmetko,* 840 F.2d 467, 475 (7th Cir.1988); *Lyznicki v. Board of Education,* 707 F.2d 949, 951 (7th Cir.1983). It has also implied that such a claim could only exist, if at all, under circumstances involving an express contractual or statutory provision establishing the asserted right to the particular job assignment, and could not be based on an implied or noncontractual understanding between the parties. *See, Gustafson v. Jones,* 117 F.3d 1015, 1020 (7th Cir.1997). Ulichny asserts, at best, such an implied understanding, one that contradicts the language and spirit of the express contractual and statutory provisions.

Accordingly, for all of the reasons expressed above, the Court concludes that Ulichny did not have a property interest in performing the duties normally expected of a school principal in Wisconsin. Having no such property interest, she cannot claim the protections of the 14th Amendment as a challenge to the proposed and/or actual revision of her job duties.

**2. Constructive Discharge**

 Ulichny also asserts a property interest in her employment *per se,* which

was allegedly deprived when Flynn and the School District constructively discharged her by revising her job duties and thus making her working conditions so intolerable that she was compelled to quit. It is well-established that a public employee with a term contract that can only be terminated for cause has a property interest in continued employment for the duration of the contract which is protected by the 14th Amendment. *See, Thornton v. Barnes,* 890 F.2d 1380, 1386 (7th Cir.1989). It is also well-established that a public employer who makes the working conditions of such an employee so intolerable that he or she is compelled to quit prior to the expiration of the contractual term deprives the employee of property within the meaning of the 14th Amendment. *See, Parrett,* 737 F.2d at 694. Accordingly, if Ulichny could create a genuine issue of material fact as to whether or not she was constructively discharged, this particular claim might survive summary judgment. The Court concludes, however, that the record is insufficient in this regard.

■ "A constructive discharge occurs when the employer makes conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign." [16] *Jett v. Dallas Independent School District,* 798 F.2d 748, 755 (5th Cir.1986); *see also, Parrett, supra; Ugalde v. W.A. McKenzie Asphalt Co.,* 990 F.2d 239, 242–43 (5th Cir.1993); *Lewandowski,* 711 F.Supp. at 1494; *Jeffries v. State of Kansas,* 147 F.3d 1220, 1233 (10th Cir.1998). "However, the decision to resign must be objectively reasonable." *Lewandowski, supra.* "The determinative factor is not the employer's intentions, but the effect of the conditions on a reasonable employee." *Id.; see also, Jett, supra.* A plaintiff's "subjective view of the employment environment" and/or his "subjective impressions as to the desirability of one position over another" are equally irrelevant. *Jeffries, Lewandowski, supra.* "The working conditions must be intolerable to a reasonable person—not an overly sensitive person." *Lewandowski, supra.* Accordingly, the question is not whether Flynn and the School District tried to force Ulichny to quit or suggested that she do so, or whether Ulichny was so humiliated and frustrated by the situation that she was compelled to quit, but whether a reasonable person under the circumstances would have found the job situation so intolerable as to have no choice but to quit. The burden in this regard is on Ulichny, *see, Ugalde, supra,* and she fails to meet it.

■ Ulichny cites a litany of developments and actions that allegedly created an intolerable working environment. First and foremost, she cites the revision of her job duties, such that she (1) no longer hired or supervised teachers and/or support staff, (2) no longer handled student discipline for the 7th and 8th grades or in any suspension or law enforcement situations, (3) no longer conducted—and sometimes was not even informed of—certain staff meetings, (4) was made to spend almost 4 hours every day in "monitoring duties" which were typically the bailiwick of an instructional aide, and (5) was assigned other administrative duties only on an *ad hoc* basis. Other complaints stem from the change in job responsibilities as well. For example, Ulichny cites the fact that Flynn asked her to assist in the revi-

---

**16.** Ulichny cites to a 1911 Wisconsin state court case for the proposition that a refusal to allow an employee to perform the principal service he or she agreed to perform, coupled with the substitution of a different service in its place, constitutes a constructive discharge. *See, Loos v. Geo. Walter Brewing Co.,* 145 Wis. 1, 3–4, 129 N.W. 645 (Wis.1911). However, whether or not Wisconsin common law recognizes such conduct as a constructive discharge for state law purposes is irrelevant to whether a federal court applying federal law (state law only creates the underlying property interest) treats the same as a constructive discharge. Ulichny cites to no federal case law—within this Circuit or elsewhere—that a constructive discharge can be shown upon a simple modification of contractual duties. Rather, the cases uniformly hold that constructive discharge requires a showing of intolerable working conditions to a reasonable employee working under the same conditions.

sion of her duties, initially refused to provide her with a copy of the proposed changes prior to a Board meeting on the same, revealed her loss of supervisory duties to the public through the use of an overhead projector at that meeting, moved his office into her building and "took control" of the school, took control of the School Advisory Council and the Mentoring Program—programs she created and organized, began to send her memos citing or documenting perceived lapses in her performance, never contacted her regarding school issues once she was out of the school due to illness, and never explained to her the reasons why these changes were taking place. In addition to her complaints surrounding the job revisions, Ulichny also cites the School District's decision to release—without comment—the parents' letters to the public and Flynn's frequent suggestions that she consider finding a job in another district.

Before addressing these specific complaints, it is important to first step back and look at all of these complaints within the general context. What is clear from the foregoing litany of complaints, and from the record as set forth in the factual section, *supra,* is that the political fallout from the handling of the "wedgie" incident brought substantial pressures to bear in the Merton Community School District and caused a substantial amount of stress and humiliation for both Ulichny, Flynn, the Board and the School District as a whole. It is also clear that the political fallout was something that neither Ulichny nor the School District could control; the story assumed a course and life of its own through the efforts of several disgruntled parents and an energized media (both locally and nationally). It is finally clear that the Board—after perhaps underestimating the shelf-life and/or magnitude of the situation, and when forced to consider the issue of Ulichny's job renewal in an open session with public input—quickly surmised that the political situation required action to quell the storm. The action it took—and which the Court has

already found to be lawful and within the Board's authority—was to make Flynn the direct principal of Merton Intermediate School and to revise Ulichny's job duties such that she was essentially an assistant principal with reduced responsibilities (at least initially) acting on Flynn's direction and guidance. Perhaps this was unfair or even cowardly (considering the undisputed strides Ulichny had made prior to and for some time after the "wedgie" incident), and certainly it was a setback for Ulichny, but it was a reasonable (some would say likely) option for elected officials called upon to respond to a swelling and extreme public reaction. Ulichny may have expected or hoped that the School Board would exercise some courage and weather the storm without changing her status, but the Court cannot say a reasonable person could find it intolerable that they did not. Under the circumstances, a reasonable person would understand that, as a public employee, the manner in which one performs his or her duties will always be scrutinized—sometimes quite publicly and maybe even unfairly—and may at times provoke public outrage, at which point one may expect to face, *inter alia,* the possibility of unpleasant public or private criticism, increased scrutiny on the job and undesirable job changes. That is the reality of public employment. Job actions and job changes that might be viewed as intolerable in the private workplace take on a different shape when applied to important public figures such as a public school principal. Ulichny seems to lose sight of this reality when making her claim of constructive discharge.

Even absent the context of public employment, however, the manner and details of the revision of Ulichny's job duties do not strike the Court as so intolerable that a reasonable employee would quit. When one compares her proposed new duties with the job description that previously covered her employment, one realizes that, despite losing direct responsibility for a number of important areas of school ad-

ministration, Ulichny still retained a number of important duties typically associated with the position of principal. These included student discipline in grades 4–6, CP development and monitoring, teacher-based curriculum committees, instructional leadership, building management, textbook adoption, instructional materials, special education, student schedules, teacher schedules, grants, "SST", budget issues, the Parent Connection newsletter, the School Performance Report, the District Assessment Coordinator, "and other duties as assigned by the District Administrator." (Flynn Aff., Ex. QQ; Ulichny Aff., Ex. 52.) These are all duties that also fell within the job description of her counterpart, Mark Budisch, as principal of the K–5 school, so Ulichny can hardly suggest that these were make-work tasks falling beneath the dignity of a principal to perform. Moreover, the meager work reports reflecting what she actually was doing on a daily basis (she only worked for 3 weeks after the changes were implemented) show that she was performing several tasks associated with the principal position, *i.e.*, she interviewed candidates for the positions of substitute teacher and "EEN aide," she met with teachers and teacher assistants regarding various instructional issues, she participated in a meeting concerning the records of new students at the school, she visited all of the classrooms, and she met several times with Flynn himself to discuss school matters. While she was required to spend a large amount of time on the playground and in the lunchroom and hallways monitoring student activities, Flynn and the District explain that this was intended to increase her visibility at the school and enable her to develop relationships with the students that extended beyond a disciplinary nature. In short, Ulichny was not asked to do menial or "degradingly inferior" tasks. This is not a case like *Parrett v. City of Connersville, supra,* where a former chief of detectives was removed and demoted to the uniformed force as a "line captain," given a windowless former storage closet as an

office with no telephone and—more importantly—no work to do, all because of a powerful enemy's personal vendetta. In such an extreme situation, the 7th Circuit has recognized that a demotion or job reassignment that involves no loss of pay could support a claim of constructive discharge:

> To pay a man without asking him to do any work in exchange might appear to be the antithesis of constructive discharge—might appear to make his "working" conditions paradisal [sic] rather than infernal. This might well be true if the work was dirty, dangerous, unhealthy, backbreaking, repetitive, or otherwise disagreeable, or if the worker had the personality of a remittance man. But as a former chief of detectives, still young, Parrett was not a drudge or a time-server but an ambitious professional. Enforced idleness was not only a humiliating counterpoint to his years as detective chief but would if prolonged have depreciated his professional skills to the point where it would have been difficult for him to work his way back, in Connersville or elsewhere, to a responsible position. For anyone with some self-respect the position that Cordes and the other defendants placed Parrett in was intolerable; even if his health had not collapsed under the strain, he would have had to quit.

*Parrett,* 737 F.2d at 694. Ulichny was not subjected to such treatment. She retained her title and pay as principal, but more importantly, she continued to perform duties appropriate to a principal, albeit not all the duties typically associated therewith. Ulichny cannot argue that she was subjected to "enforced idleness" and/or faced the distinct possibility that her professional skills as a principal would substantially depreciate. And while Ulichny certainly lost direct responsibility for some of the weightier or more significant duties of a principal—such as teacher supervision and overall student discipline—she retained an assisting role in such functions

and was told by Flynn—who repeated the same to the entire staff at the beginning of the year—that in time he might begin to delegate more of these responsibilities back to Ulichny and increase her role in such matters. Therefore, unlike the plaintiff in *Parrett,* Ulichny had a meaningful opportunity to work her way back to a more responsible position over time, either in Merton or elsewhere. But it was going to take time, and Ulichny was apparently unwilling to give it much of a chance. This is evidenced by her attorney's comment— during a meeting with Flynn concerning the scope and implementation of Ulichny's revised duties—that he "was not really confident things would work out" if the changes Flynn proposed went into effect. It is further evidenced by the fact that Ulichny refused to assist Flynn in revising her job duties, taking the position that no changes were necessary and thereby suggesting that any change was unacceptable (not to mention foreclosing the one possibility she had to influence the result). It is finally evidenced by the fact that Ulichny only worked under the new regime for three weeks (less, if you factor in the Labor Day holiday). As other courts have noted, "[a]n employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged." *Yearous v. Niobrara County Memorial Hospital,* 128 F.3d 1351, 1357 (10th Cir.1997)(quoting, *Tidwell v. Meyer's Bakeries, Inc.,* 93 F.3d 490, 494 (8th Cir.1996)). From the foregoing, it is clear that what Ulichny found intolerable was the fact that the School Board concluded that the "wedgie" incident and the resulting complaints from parents required any changes in her job situation at all, much less the specific changes ultimately imposed. That is an unreasonable position.[17]

Many of Ulichny's remaining complaints strike the Court as hypersensitive. The decision that the Board made to discuss the proposed changes to Ulichny's job description in a session open to the public was necessitated by District Attorney Bucher's warning that a prior vote on Ulichny's job status in a closed session violated Wisconsin's Open Meetings Law. The use of an overhead projector during that meeting to create a visual of what was orally proposed hardly altered the nature of the disclosure. Similarly, the School District's decision to release the parents letters regarding Ulichny to newspaper reporters was arguably required under Wisconsin's Public Records Law.[18] *See, Woznicki v. Erickson, supra.* That same law does not impose any requirement on the School District to cite or publicly disavow any inaccuracies contained in the information released, and Ulichny's request to that effect was unreasonable. The memos from Flynn documenting lapses in Ulichny's performance may have been a new approach to managing Ulichny, but so was the entire situation. Prior thereto, Flynn was not contemplating becoming the direct Principal of the Intermediate School and

---

17. Ulichny does state that—on her last day of active employment—she asked Flynn if the current division of responsibilities was to continue, and he responded that it would. But one cannot reasonably infer from this statement that Flynn meant the revised job duties were permanent, especially in light of his earlier comments that over time he may delegate more of the supervisory and disciplinary duties back to Ulichny. That this re-delegation of duties did not happen immediately, and still was not going to happen after only three weeks, is hardly an indication that the situation was permanent.

18. Moreover, Ulichny was given notice of the District's decision to release the records prior to their release, and allowed a reasonable time to file a state court action challenging their release, consistent with Ulichny's rights under *Woznicki v. Erickson, supra.* Ulichny chose not to challenge the release of these documents in state court, claiming that the School District could not reasonably place her in the position of having to file a lawsuit that would only further jeopardize her reputation with the public. But it was not the School Board which placed her in that position; the Wisconsin Supreme Court placed her in the position by creating the *Woznicki* procedure.

was not directing and evaluating—on almost a daily basis—the details of Ulichny's job. Such direct, immediate management and observation of Ulichny's performance naturally creates the possibility of increased scrutiny. Nor was criticism and consequent oversight new to Ulichny. She had received substantial criticism during her first two years as Principal and had been forced to submit to an "assistance plan" through which her performance and duties were monitored much more closely than other principals. She had only recently begun to get favorable reviews, and according to Flynn, once the "wedgie" incident boiled over politically and the Board took action, Ulichny regressed. And Flynn's recurring suggestions that she consider looking for a job in another district if she was unhappy with the changes in her current position—while perhaps indicative of a malignant intent, an issue irrelevant to constructive discharge—could be viewed as the natural frustration of a supervisor who cannot placate a disgruntled employee.

Accordingly, viewing the situation in its entire context as well as the specific conditions objected to by Ulichny, the Court finds that no reasonable jury could conclude that a reasonable person standing in Ulichny's shoes would have found the working environment so intolerable as to leave no choice but to quit. Ulichny was not constructively discharged and was not deprived of her property interest in public employment.

## B. DENIAL OF LIBERTY INTEREST

 Ulichny also argues the deprivation of a liberty interest; specifically, a liberty interest in pursuing her occupation. "The concept of liberty protected by the due process clause has long included occupational liberty—'the liberty to follow a trade, profession, or other calling.'" *Wroblewski v. City of Washburn,* 965 F.2d 452, 455 (7th Cir.1992). "The cases have consistently drawn a distinction, however,

between occupational liberty and the right to a specific job." *Id.* "'It stretches the concept too far to suggest that a person is deprived of "liberty" when he simply is not rehired in one job but remains as free as before to seek another.'" *Id.* (quoting, *Roth,* 408 U.S. at 575, 92 S.Ct. 2701). "It is the liberty to pursue a calling or occupation, and not the right to a specific job, that is secured by the Fourteenth Amendment." *Id.* Thus, "the state infringes on an employee's liberty interests if it discharges an employee while making false charges against him, so damaging the employee that he is precluded as a practical matter from finding other government employment." *Strasburger v. Board of Education, Hardin County Community Unit School District No. 1,* 143 F.3d 351, 356 (7th Cir.1998). "[T]he cases make clear that there is no deprivation of liberty if the employee is not fired," although a "significant demotion" to a "degradingly inferior" job could implicate a liberty interest, such as where an employee is demoted from "a responsible and well-paid job to a menial and low-paying one." *Lawson v. Sheriff of Tippecanoe County,* 725 F.2d 1136, 1139 (7th Cir.1984); *Terry v. Woods,* 803 F.Supp. 1519, 1524 (E.D.Wis.1992); *see also, Gustafson,* 117 F.3d at 1020 (public employee may be deprived of a liberty interest if she is "demoted to a position 'far beneath the one [she] had'"). Of course, the School District did not fire Ulichny, and the Court—through its constructive discharge analysis—has essentially found that her new duties were not "degradingly inferior" or "far beneath" the duties she previously performed. Accordingly, Ulichny's liberty interest claim fails at the outset.

 Assuming, however, that Ulichny had made a sufficient showing of constructive discharge, to then "prevail on [her] liberty cause of action, [she] must show that '(1) [s]he was stigmatized by the defendant's conduct, (2) the stigmatizing information was publicly disclosed, and (3)[s]he suffered a tangible loss of other

employment opportunities as a result of public disclosure.'" *Strasburger,* 143 F.3d at 356 (quoting, *Johnson v. Martin,* 943 F.2d 15, 16 (7th Cir.1991)). "The first element requires the employee to show that a public official made defamatory statements about him." *Id.* "These statements must be false assertions of fact." *Id.* "True but stigmatizing statements that preclude further government employment do not support this type of claim." *Id.* "Nor do statements of opinion, even stigmatizing ones, if they do not imply false facts." *Id.* "We also require the statements to come from the mouth of a public official." *Id.* "Rumors and statements made to public officials do not suffice." *Id.* And "[s]ince the remedy available to a discharged employee who proves all the elements of the cause of action is a name-clearing hearing, ... the statements must be of a kind such that the discharged employee could refute them and clear his name, given the opportunity." *Id.*

In addition to the foregoing standards, it is important to note that "not every remark which may arguably affect one's reputation violates due process if made by a government official without a hearing, for the fourteenth amendment protects only against charges that 'might seriously damage [one's] standing and associations in the community." *Hadley v. County of Du Page,* 715 F.2d 1238, 1245 (7th Cir.1983)(quoting, *Lipp v. Board of Education of City of Chicago,* 470 F.2d 802, 805 (7th Cir.1972)). Thus, "[t]he Seventh Circuit has taken the position that a mere charge of mismanagement is not enough to give rise to a liberty interest requiring a hearing." *Id.* "An unelaborated charge of 'incompetence, neglect of duty and malfeasance of office' is of a different order of magnitude than charges of dishonesty, immorality, disloyalty, Communism, subversive activities, alcoholism or narcotics violations." *Id.* (quoting, *Adams v. Walker,* 492 F.2d 1003, 1008–09 (7th Cir.1974)). "Liberty is not infringed by a label of incompetence or a failure to meet

a specific level of management skills, which would only affect one's professional life and force one down a few notches in the professional hierarchy." *Lashbrook v. Oerkfitz,* 65 F.3d 1339, 1348 (7th Cir.1995) (quoting, *Mitchell v. Glover,* 996 F.2d 164, 167 (7th Cir.1993)).

With these principles in mind, the Court turns to the public statements which Ulichny relies upon as defamatory or stigmatizing in a constitutional sense. First, Ulichny cites the many public statements by Flynn and Board President Brown—in both newspaper articles and District newsletters—indicating that the Board might strip Ulichny of her duties as principal, and then later confirming that Flynn would serve as the direct supervisor and/or principal of the Intermediate School and that many of Ulichny's duties—including her supervisory duties— had been reassigned to either Flynn or Budisch. There are several reasons why such statements are not stigmatizing. First, the predictions regarding what the Board might do in the future with respect to Ulichny's job duties were—as predictions—nothing more than opinions. They did not communicate a false statement of present fact. Second, the predictions and subsequent statements concerning the actions which eventually were taken were true. Flynn did become the Intermediate School principal, he did assume direct supervision of all employees, and Ulichny did lose many of her prior duties, including her supervisory duties over professional and support staff. Truth is an absolute defense to any claim of defamation, including one implicating constitutional protections. Of course, Ulichny's argument is a bit more subtle than this. Ulichny argues that by publicly communicating its decision to remove many of her duties as principal and to install Flynn as the direct principal of the Intermediate School, the School District "effectively blacklisted" her by creating a false implication that she was unfit to serve as a principal. But the statements do not imply that Ulichny was

morally unfit for her job because of some act or history of moral turpitude. At worst, these statements imply that Ulichny's handling (or mishandling) of the "wedgie" incident—the circumstances of which remained the underlying focus of the news stories throughout the period—warranted a demotion. Such a "label of incompetence" or implied "failure to reach a specified level of management skills" is the type of statement which the 7th Circuit has clearly held not to give rise to a deprivation of liberty interests. In short, statements about Ulichny's changed job responsibilities implied nothing more than managerial mistakes which "force[d][her] down a few notches in the professional hierarchy."

■■■■ Ulichny also relies upon (1) a public statement by Flynn indicating that he shared some of the parents' concerns regarding a "lack of trust" between Ulichny and some of the employees on her staff and/or the parents themselves, and (2) statements by Candidate O'Neill that Ulichny is a "liar" and that her revised role "should be one that does not interact with kids." Ulichny argues that these statements imply that she is a "dishonest" person and thereby charge her with moral turpitude. First, it is undisputed that O'Neill's statements were made at a time when he was a candidate for a seat on the School Board, not when he actually sat as a Board member. Accordingly, the statements attributable to him were not "from the mouth of a public official" at the time they were made, and there is no evidence that O'Neill reiterated these statements publicly once elected to the Board. Second, Flynn's comment regarding sharing the concerns of parents over a perceived "lack of trust" is taken out of context. The comment was made in response to a number of concerns raised by parents at a Board meeting, some of which had nothing to do with Ulichny *per se*. Reference to the full text of Flynn's remarks confirms that he was addressing a group of issues as a whole and did not mention Ulichny's name in connection with the "lack of trust" remark:

> [Flynn] went on to say that he shared some of the concerns raised by the residents, including: teacher morale, *lack of trust*, the public's regard for the administration, an unsettled teachers' contract, teachers' regard for the board and teacher turnover.

> [Flynn] said there is a misperception as to why some teachers have left the district. The reasons are stated in correspondence the district has received from the teachers. He did not elaborate on the reasons.

> Flynn also addressed concerns that had been raised about textbooks, students' placement at Arrowhead High School and curriculum....

> [Flynn] added he is looking at providing time for teachers to talk to each other about educational strategies....

It is unreasonable to read the foregoing comments as containing a direct or implicit charge by Flynn that Ulichny is a dishonest person who cannot be trusted. It is particularly unreasonable if one considers other statements attributed to Flynn in these same articles, statements which support Ulichny's response to the "wedgie" incident and maintain a certain level of neutrality towards the parents' criticisms of Ulichny:

> Superintendent Mark Flynn had completed Ulichny's evaluation. He has steadfastly upheld her decision to call law enforcement to the school.

> &ast; &ast; &ast; &ast; &ast; &ast;

> Asked about parents' complaints, Superintendent Mark Flynn said: "I'm not going to substantiate or deny them. It was these parents' opportunity to state their perceptions and that's what they did."

> Parents of the youths said administrators overreacted by calling police. But Flynn said the district acted appropriately.

In short, Ulichny stretches to fit these straightforward comments concerning managerial complaints and criticisms from Merton residents into the much narrower category of constitutional defamation.

■ Finally, Ulichny points to the District's release of documents to the public (via the media) which Flynn had previously stated were "ludicrous" and "full of lies," *i.e.*, the parents' letters to the District criticizing Ulichny and her handling of the "wedgie" incident. First, these documents were released pursuant to lawful requests for the same under Wisconsin's Public Records Law. The District provided notice to Ulichny of the release of the documents and allowed her a reasonable opportunity to file a state court action challenging the District's decision to release the records. The District's actions were clearly taken in a good faith attempt to comply with its legal obligations under the Public Records Law and the *Woznicki* case. Ulichny, however, fearing further public criticism, decided not to challenge the release of these documents. While that may have been a reasonable decision under the circumstances, Ulichny cannot have her cake and eat it too. She cannot sit on her state right to challenge the disclosure of allegedly defamatory material prior to its release and then seek damages in federal court for not being provided "due process," *i.e.*, for not being given a pre-deprivation hearing equivalent to the one she passed on in the first place. The 14th Amendment does not bar deprivations of liberty *per se*; it merely requires notice and an adequate opportunity to be heard prior to the deprivation. Ulichny was provided that here and she chose not to utilize it. Second, the letters at issue were statements written by parents and/or other residents of the district. They did not come "from the mouth of a public official." Ulichny counters by quoting *Mitchell v. Glover*, 996 F.2d 164, 167 (7th Cir.1993) for the proposition that a liberty claim survives upon a showing that public officials "*participated* in the dissemination of [sufficiently damning] information to the public." (Emphasis added.)

But the Court does not think the 7th Circuit intended this statement to overturn a long line of authority within the Circuit indicating that liberty interests are only implicated by defamatory statements spoken or written by a public official. Or if "participation" is all that is required, the same cannot be based upon a municipality's good faith attempt to comply with a lawful request for documents under a state open records law. A contrary ruling would put state agencies and municipalities in a legal quandary whenever they are served with an open records request relating to public employees.

Ulichny's latter complaint touches upon a larger problem with her liberty claim that neither side addresses fully. That is, Ulichny submits fairly strong evidence that the publicity surrounding this entire affair has severely restricted her ability to get a principalship—or even a somewhat lesser position—in another school district. She has good credentials on paper, she has made extensive efforts to get a new position, yet she has received very few interviews and no offers. (Ulichny Aff. at ¶ 128.) Moreover, she submits affidavits from the District Administrator—Dr. Sarah Jerome ("Dr. Jerome")—and a Board member—Michael O. Bohren ("Bohren")—of the Kettle Moraine School District ("KMSD"). (*See*, Dr. Jerome Aff. and Bohren Aff.) According to those affidavits, Dr. Jerome recommended Ulichny for the position of District Guidance Counselor, but Bohren asked that her name be removed from the list, even after meeting with Ulichny personally. (Dr. Jerome Aff. at ¶¶ 4–8; Bohren Aff. at ¶¶ 3–5.) Bohren explains his request as follows:

> I had seen the publicity related to Ms. Ulichny in her position at the Merton Community School District. I was aware that the same newspapers which covered the Merton Community School District (*The Milwaukee Journal Sentinel, The Lake Country Reporter*, and *The Waukesha Freeman* ) as well as the same reporters for those papers, also

covered the Kettle Moraine School District. Thus, I knew that if the Kettle Moraine School District hired Ms. Ulichny, the connection would be made and would be reported in the newspapers. Because I did not feel that this type of publicity would have been beneficial to the School District, I asked Dr. Jerome to remove Ms. Ulichny's name from the Personal Summary Sheet. Dr. Jerome removed Ms. Ulichny's name from the Personal Summary Sheet, as requested.

(Bohren Aff. at ¶ 4.) As a result of Bohren's concerns, Ulichny did not get the position. (Bohren Aff. at ¶ 6.) What is interesting to note is that Bohren's concerns stemmed from his fear of the general "publicity related to Ms. Ulichny," not any specific statement made by a specific public official in Merton or any substantial belief that Ulichny was morally unfit for the job. Of course, when Bohren refers to "publicity related to Ms. Ulichny," he necessarily refers to a large volume of material, only a small portion of which is attributable to Flynn or the Merton Board. The engine driving that publicity, and which made up most of its content, was the uniqueness of the "wedgie" incident from a disciplinary perspective and the complaints of a large and vocal group of disgruntled parents and residents. Bohren feared a decision which would transfer or replicate that phenomenon in KMSD. In this sense, Ulichny's very real problem in finding employment is not tied to specific public statements by Flynn or the Merton Board, but rather to the "entirely stigmatizing atmosphere" that developed after the "wedgie" incident became a hot issue with parents in the Merton Community School District. *Hadley,* 715 F.2d at 1247. Neither Flynn nor the Merton School Board can be held responsible for such a "stigmatizing atmosphere." Rather, it was the nature of the underlying incident and the parents' reaction which created that atmo-sphere, and thus one is left searching for sufficient "government action" infringing upon Ulichny's liberty rights:

> Finally, Hadley argues that he had a right to a hearing to clear his name since his discharge occurred in the "midst of defamatory charges" against himself, that is, his dismissal took place during an "entirely stigmatizing atmosphere." We hold that this argument is without merit. Because this suit is based on 42 U.S.C. § 1983, Hadley is required to allege governmental action which infringed upon his particular rights. If his injury does not result from governmental action, then he has no cause of action against the defendants under that section. The plaintiff's pleadings and affidavits have failed to establish that it was the defendants' actions or statements that resulted in his alleged deprivation of due process as he has failed to cite a specific statement made by the defendants which resulted in any "stigma" to his reputation.

*Id.* Here, the public statements and actions of Flynn and the School Board were a reaction to the "stigmatizing atmosphere" that lies at the heart of Ulichny's problem and added little to it. At worst, such statements and actions raised questions regarding Ulichny's managerial competence as a result of her handling of the "wedgie" incident. As explained *supra,* such statements do not create a stigma for purposes of the 14th Amendment.

 Accordingly, the Court concludes that no reasonable jury could conclude that Ulichny was defamed or stigmatized for purposes of the 14th Amendment by the statements of any of the defendants referenced herein, and thus she was not deprived of her liberty interest in continuing her career in public school administration.[19]

---

19. Ulichny appears to raise a substantive due process claim in her briefing on summary judgment. As defendants correctly point out, however, such claims must be based on the denial of a fundamental right—one created by federal law—and state action resulting in or stemming from the denial or deprivation of public employment does not violate a funda-

## C. QUALIFIED IMMUNITY

The Court next considers the issue of qualified immunity. Of course, because the Court has already found that there has been no violation of Ulichny's property or liberty interests, the individual defendants are necessarily immune from liability. But if the 7th Circuit were to view matters differently on appeal, the federal claims against the individual defendants would still be subject to a defense of qualified immunity.[20]

 Under the defense of qualified immunity, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Supreme Video, Inc. v. Schauz,* 808 F.Supp. 1380, 1388 (E.D.Wis.1992), *reversed-in-part on other grounds,* 15 F.3d 1435 (7th Cir.1994)(quoting, *Harlow v. Fitzgerald,* 457 U.S. 800, 807, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "While the foregoing issue is a question of law, 'it is not answered in the abstract but in reference to the particular facts of the case.'" *Id.* (quoting, *Rakovich v. Wade,* 850 F.2d 1180, 1202 (7th Cir.1988)). "Once the defendant's actions are defined or characterized according to the specific facts of the case this characterization is compared to the body of law existing at the time of the alleged violation to determine if constitutional, statutory, or case law shows that the now specifically defined actions violated the clearly established law." *Rakovich,* 850 F.2d at at 1209. "It is the plaintiff who bears the burden of establishing the existence of the allegedly clearly established constitutional right." *Id.* The plaintiff "does not meet this burden by alleging the violation of broad constitutional rights, such as the right to due process or the right to be free from unreasonable seizures, and then claiming that such rights are 'clearly established.'" *Supreme Video,* 808 F.Supp. at 1388. "Rather, 'the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* at 1388–89 (quoting, *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "According to the Supreme Court, 'the state of the law is evaluated by reference to the opinions of this Court, of the Courts of Appeals, or of the local District Court....'" *Id.* at 1389 (quoting, *Procunier v. Navarette,* 434 U.S.

---

mental federal right. *See generally, Schacht v. Wisconsin Department of Corrections,* 175 F.3d 497, 502 (7th Cir.1999); *Lewandowski,* 711 F.Supp. at 1492, n. 4. Moreover, "substantive due process does not come into play when a particular part of the Constitution 'provides an explicit textual source of constitutional protection against a particular sort of government behavior,....'" *Schacht, supra.* Both the property and liberty prongs of the 14th Amendment provide an explicit source of constitutional protection here. Finally, in order to prevail on a substantive due process claim, Ulichny must show that defendants' conduct was "so egregious as to shock the conscience." *Id.* Nothing Ulichny alleges—even if we assume that Flynn and his fellow school district officials decided to force her out of her job as a scapegoat for their own political problems—rises to that level. *See, Schacht, supra* ("No one is saying that sham procedures, or venal motives for pushing someone out of a job, amount to admirable behavior on the part of those who use them. On the other hand, workplace jealousies are unfortunately not unknown. [Plaintiff's] own theory explaining why the [defendants] suddenly pushed him out the door after so many years of exemplary service describes no more than this. We acknowledge that a formula that requires the conscience to be shocked is necessarily somewhat subjective for the judges who must apply it, but we are confident that even if everything [plaintiff] says and suspects is true, his experience did not rise to that level.").

20. Defendants also argue that absolute legislative immunity is available to the individual defendants, but because the Court concludes that qualified immunity suffices as a defense, it does not consider the issue of absolute immunity.

555, 565, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful. . . ." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034. Instead, "it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.*

Within the context of Ulichny's federal claims, the qualified immunity defense raises three questions: (1) Would a reasonable school district official have known that it was clearly established under the law that a public school principal has a state contractual and/or statutory right—and therefore a federal property interest—in performing the normal duties expected of a school principal in Wisconsin; (2) would a reasonable school district official have known that it was clearly established under the law that the revisions of Ulichny's job duties and corresponding changes in her working conditions qualified as a constructive discharge and thereby deprived Ulichny of her property interest in public employment; and (3) would a reasonable school district official have known that it was clearly established under the law that the public statements and actions of Flynn and other members of the School Board stigmatized Ulichny so badly that she was forever foreclosed from pursuing her career in public school administration and thereby deprived Ulichny of her liberty interest in her career? The Court answers all three questions "no."

 As for the first question, Ulichny cannot point to a single state statute or state/federal legal decision that states either that a school principal has a contractual right to perform the duties normally expected of a school principal in Wisconsin or that a school district cannot modify or decrease the duties of a school principal without just cause. Indeed, as explained *supra,* the one statute that addresses the duties of a principal seems to leave those duties to the discretion of the school district and/or its district administrator. *See,*

Wis. Stat. § 118.24(3). Moreover, there is no express provision in Ulichny's contract establishing either of the foregoing statements as operative. Indeed, Judge Reynolds' decision in the *Terry* case, *supra,* made it clear that a contractual provision which lists or specifies the duties a principal will be expected to perform *does not* imply a reciprocal obligation on behalf of the school district to allow the principal to perform all of those duties for the duration of the contract. Moreover, the contract contains other provisions which—like Wis. Stat. § 118.24(3)—seem to leave the specification of Ulichny's duties in the discretion of the School Board. In the end, Ulichny must rely on the weight of Hilston's claim that there is an unwritten and unspoken "understanding" within the public school industry that the foregoing statements apply. A reasonable public school official could hardly be expected to anticipate that such a vague and ethereal "understanding"—even if it exists—would be determinative of the legal issue or trump the express language and/or implied meanings of the governing statute and contract.

 As for the second question, the issue of whether the change in Ulichny's working conditions amounted to a constructive discharge was, at best, a close call on summary judgment, even for a judge (and ultimately not close enough, in the Court's view). At best, one might take the position that reasonable minds could differ, *i.e.,* that a reasonable jury could conclude that a reasonable person in Ulichny's shoes would have found the changes so intolerable that there was no choice but to quit. But even if the Court allowed Ulichny that small victory, the same works against her on the qualified immunity issue. There, the relevant question is essentially turned around, *i.e.,* could a reasonable jury conclude that a reasonable school official would have found the changes *not* so intolerable as to leave a reasonable employee with no choice but to quit. If reasonable minds could differ, which is the most Ulichny can argue on this record,

then the individual defendants are protected from liability.[21]

 Finally, as to the third issue, the relevant case law is replete with quotes—from the 7th Circuit and other courts—that the proffered defamatory statements must come from the mouth of a public official and must express or imply something more than managerial or professional incompetence. Certainly a reasonable public school official could not be expected to anticipate that O'Neill's statements as a candidate for public office, or the release of third-party correspondence pursuant to a lawful open records request, qualify as statements from the mouth of a public official. Moreover, a reasonable official could view the statements made by Flynn and others regarding the proposed change of Ulichny's job duties and a perceived—though unspecified—"lack of trust" within the Merton Intermediate School as implying nothing more than managerial incompetence. The official would certainly not have to interpret the same as containing a public charge of dishonesty, as Ulichny contends.

Accordingly, even if the underlying liability issues are determined on appeal to be close enough to survive summary judg-

ment, the Court concludes that the individual defendants would be immune from any liability under § 1983 in their personal capacities.[22]

### D. CONSPIRACY CLAIMS

Defendants raise several defenses against Ulichny's claim that the defendants conspired to deprive her of property and liberty interests without due process of law. However, because the Court has already concluded that no such deprivation occurred, the conspiracy claims are inoperable and the Court declines to consider the asserted defenses. The federal conspiracy claims are dismissed accordingly.

### E. STATE LAW CLAIMS

Ulichny's federal claims provided the basis for federal subject matter jurisdiction in this matter. Those claims being dismissed, the Court has the discretion to dismiss or remand the state law claims. The Court declines to exercise its supplemental jurisdiction over these claims and remands the same to Waukesha County Circuit Court.

NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:

---

21. Ulichny's claim—undisputed by the defense—that Flynn repeatedly suggested that she seek employment elsewhere if she was unhappy with the changes in her job duties might indicate an intention on Flynn's part to compel Ulichny to leave. However, "a defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense." *Crawford–El v. Britton*, 523 U.S. 574, 587–88, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). Ulichny's reference to Wisconsin state law cases indicating that—for state law purposes—there may exist an exception to immunity for acts that are "malicious, willful and intentional" are inapposite.

Ulichny also argues—again citing to Wisconsin state law decisions—that the qualified immunity defense does not apply because the defendants failed to perform "ministerial" duties as opposed to "discretionary" duties.

However, it is well-established that the common law's distinction between ministerial and discretionary acts for state law immunity purposes is irrelevant to a qualified immunity defense asserted in a federal § 1983 action. *See, Coleman v. Frantz*, 754 F.2d 719, 727–28 (7th Cir.1985), *called into question on other grounds, Benson v. Allphin*, 786 F.2d 268 (7th Cir.1986) (NO. 84–2186). Rather, to qualify as discretionary for federal purposes, the defendant's actions must only be "undertaken pursuant to the performance of his duties and within the scope of his authority." *Coleman, supra.* That standard is certainly met here.

22. Of course, qualified immunity would not protect the School District from municipal liability under § 1983. Defendants argue that there is no municipal liability because, *inter alia*, Wisconsin state law provides adequate post-deprivation remedies. Because the Court finds that there is no underlying deprivation of a property or liberty interest, however, the Court declines to address those issues.

1. Defendants' motion for summary judgment is granted-in-part and Ulichny's federal claims are dismissed;

2. Plaintiff's remaining state law claims are remanded to Waukesha County Circuit Court for further proceedings;

3. All additional pending motions are denied as moot.

**SO ORDERED.**